UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PAUL A. STOOT, SR., and TAMMIE L.
STOOT, husband and wife, and as parents
and guardians of PAUL A. STOOT II; and
PAUL A. STOOT II, a minor child,

           Plaintiffs,

        v.

CITY OF EVERETT, a municipal
corporation, and OFFICER/DETECTIVE
JON A. JENSEN, and JANE DOE JENSEN
and the marital community thereof,

           Defendants.

Case No. C05-1983TSZ

ORDER

## I.   INTRODUCTION

This matter comes before the Court on a Motion for Summary Judgment by Defendants City of Everett and Detective Jon A. Jensen, docket no. 27.  The Court has considered the Defendants' Motion, the Opposition filed by Plaintiffs Paul A. Stoot, Sr., Tammie L. Stoot, and Paul A. Stoot II, the Defendants' Reply, and the supporting exhibits and declarations submitted by the parties.  The Court heard oral argument from the parties on Friday, April 20, 2007, and now being fully informed enters the following Order.

ORDER - 1

## II.   BACKGROUND

On December 23, 2003, Ms. Nickey Johnson reported that Paul A. Stoot II ("Paul II") had sexually molested her daughter, A.B., in the summer of 2002.  Compl., docket no. 8, ¶ 3.3.  At the time of the allegation, Paul II was 13 years old and in the eighth grade.  <u>Id.</u> ¶ 3.8.  A.B. was three years old and Paul II was twelve in the summer of 2002 when the alleged molestation occurred.  <u>Id.</u> ¶ 3.3.  On December 23, 2003, Ms. Johnson met with Everett Police Officer Margaret Anders and provided a written statement setting forth the facts of the alleged molestation.  Anders Decl., docket no. 29, Exs. A, B.  According to Ms. Johnson's written statement, she opened the door to A.B.'s room and saw A.B. with her pants down rubbing her genitals.  <u>Id.</u>, Ex. A.  A.B. told her mom that the reason she was touching herself was because, "Paul [II] touched [her] there."  <u>Id.</u> at 1.  According to A.B., Paul II had pulled down his pants, taken out his penis, pulled A.B.'s pants down and rubbed his penis on A.B.'s genital area.  <u>Id.</u> Officer Anders completed a report and provided it to the detectives unit at the Everett Police Department.  <u>Id.</u>, Ex. B.  That ended Officer Anders' involvement in this matter.

On December 24, 2003, the file was assigned to defendant Detective Jon Jensen as a "rape of a child" investigation.  Jensen Decl., docket no. 28, Ex. A.  At the time of the assignment, Detective Jensen had been a police officer for approximately 24 years, had been assigned to the Special Assault Unit for five years, and had undergone approximately 280 hours of training devoted specifically to child sexual assault and abuse cases.  <u>Id.</u> ¶ 2.  In addition, Detective Jensen had undergone 32 hours of training focused specifically on forensic child interviewing techniques, and had conducted numerous child interviews.  <u>Id.</u>

Detective Jensen interviewed Ms. Johnson and A.B. on January 8, 2004.  Jensen Decl., docket no. 28, Ex. A.  Detective Jensen felt that Ms. Johnson had done a reliable and accurate job of obtaining information from A.B., without "leading" or "planting" a suggested story.  <u>Id.</u> ¶ 4.  Detective Jensen felt A.B. had average to above-average intelligence, and possessed excellent verbal and communication skills for a child her age.  <u>Id.</u>, Ex. A, at 1.  Detective Jensen felt A.B. was telling the truth at all times during the interview, with regard to Paul II's actions.  <u>Id.</u> ¶ 5.

ORDER - 2

During the interview, A.B. stated that Paul II put his penis on her privates, told her to "taste" his penis, and licked her vagina. Id., Ex. A, at 3-4. Detective Jensen states in his declaration that he did not introduce Paul II's name into the conversation, id. ¶ 5, and notes that A.B. identified other members of the Stoot family, which made Detective Jensen believe she understood she was referring to Paul II as the alleged suspect. Id. A.B. also stated that she licked Paul II's penis and he licked her bottom. Id., Ex. A, at 6.[1]

Before having any contact with Paul II, Detective Jensen spoke with Snohomish County prosecutors regarding interviews with juvenile suspects age 12 or older. From his conversations with prosecutors, Detective Jensen concluded that an interview with Paul II, without parental notification, was acceptable so long as he (1) treated a request for a parent the same as a request for counsel; and (2) gave a Miranda warning and had the juvenile sign the waiver form. Id. ¶ 6.

On January 15, 2004, Detective Jensen contacted Voyager Middle School, where Paul II was a student. Id., Ex. A, at 7. Detective Jensen told Bry Nelson, the Principal at Voyager Middle School, that he was coming to the school to interview Paul II. Id. He told Ms. Nelson not to contact Paul II's parents, and that he would contact them after the interview.[2] See id. Paul II arrived at Principal Nelson's office, and Detective Jensen introduced himself and directed Paul II to sit at a table. See id. Detective Jensen gave Paul II the Everett Police Department Constitutional Rights form, and read him the Miranda warning. Id., Ex. B. Paul II signed the waiver. Detective Jensen further recalls that he saw Paul II's name on a list of honor roll students in the Principal's office, but his recollection of the timing of this event lacks

---

[1] In addition, Detective Jensen's report reflects that A.B. made similar allegations against another boy named "Preston," alleging he "puts his poo poo in my pee pee." See Jensen Decl., docket no. 28, Ex. A, at 4. Detective Jensen asked a few additional questions about "Preston," but then told A.B. he "wanted to talk more about Paul and not talk about Preston anymore." See id., Ex. A, at 4-5.

[2] Paul II's parents both worked at Greater Trinity Missionary Baptist Church in Everett, about a block from Voyager Middle School.

1   credibility.[3]

2        Detective Jensen contends that during the interview he never yelled at Paul II or used his

3   physical presence to intentionally intimidate him.  Jensen Decl., docket no. 28, ¶ 9.  Detective

4   Jensen recalls that Paul II was calm and never cried during an interview that lasted for close to

5   two hours.  Id.  Detective Jensen also notes that Paul II never indicated a desire to speak with his

6   parents or an attorney.  Id.  Paul II recalls thinking he had to "just . . . sit there and do what he

7   said," the "door being closed and the blinds being closed," and "two hours [that] seemed to last

8   forever, with no bathroom, no break, or even a drink of water."  See Paul II Decl., docket no. 37,

9   at 3.  Paul II did not understand that he could stop the interview, did not understand that he

10  could have his parents with him, and did not understand that he could have an attorney with him.

11  See Andrews Decl., docket no. 43, Ex. 9-D, at 134.

12       Detective Jensen asked Paul II about A.B.'s allegations: he asked if Paul II touched her

13  with his penis, licked her vagina, or put his penis in his mouth.  Jensen Decl., docket no. 28, Ex.

14  ─────────────────

15      [3] Detective Jensen's prior testimony in a hearing in the criminal proceedings against Paul

16  II directly contradicts his sworn declaration:

17      Q.    At some point, did you determine how well Paul Stoot Jr. was doing in
              school?

18

19      A.    Yes.  *During the point when he was writing his statement, I was walking*
              *around the principal's office* and his name was listed on an honor role [sic]

20          in his office.

21  Andrews Decl., docket no. 43, Ex. 9B (Testimony of Detective Jonathan Jensen).  Detective

22  Jensen's sworn declaration recollects a different version of these facts.

23          When I entered Principal Bry Nelson's office *before interviewing Paul II*, I

24          noticed a list on the wall indicating that Paul II was on the current honor
              roll.  This suggested to me that Paul II would be capable of understanding

25          the Miranda warnings and of making a voluntary and knowing waiver of his
              rights if he chose to do so.

26

27  Jensen Decl., docket no. 28, ¶ 7.

28  ORDER - 4

1   A at 8.  Paul II denied sexual contact with A.B.  Id. ¶ 9.  Detective Jensen utilized an interview

2   technique of "blaming the victim" for the inappropriate activity, assuring Paul II that A.B.

3   "probably initiated the contact and it was most likely her fault."  Id.  Paul II eventually admitted

4   during the course of the two hour interview that he had engaged in sexual contact with A.B.  Id.

5   Detective Jensen alleges he did not make any promises to Paul II.  Id.  Paul II remembers being

6   promised that charges would not be pressed if he admitted to the contact, and that he would only

7   have to see a counselor.  See Andrews Decl., docket no. 43, Ex. 9-D, at 135.

8        After Paul II's admission of sexual contact, Detective Jensen asked him to write down his

9   version of events, which he did.  Jensen Decl., docket no. 28, Ex. A, at 11.  The written

10  statement admitted that Paul II "rubbed on [A.B.'s] vagina 2 times with clothes on then one time

11  for a couple of second [sic] with clothes off."  Id., Ex. C.  Paul II did not sign the statement.  Id.

12  Detective Jensen subsequently contacted Paul II's mother and notified her that he had taken a

13  written statement from Paul II.  Id., Ex. A, at 11.

14       On July 2, 2004, Snohomish County Deputy Prosecuting Attorney John E. Stansell filed

15  an Affidavit of Probable Cause in the Superior Court of the State of Washington in and for

16  Snohomish County, Juvenile Division.  Christie Decl., Ex. A.  Prosecuting Attorney Janice Ellis

17  charged Paul II with Child Molestation in the First Degree.  Id., Ex. B.  Thereafter, Paul II

18  underwent a  psychological evaluation.  Judge Ronald Castleberry subsequently granted Paul II's

19  Motion to Suppress his confession on the basis of the Court's finding that Paul II was

20  "susceptible to being manipulated and would not be the type that would question authority

21  figures."  Id., Ex. C.  Judge Castleberry also found that Paul II "did not make a knowing and

22  intelligent waiver of his Miranda rights."  Id.  Paul II's written statement was inadmissible, and

23  his oral statements were suppressed.  During the subsequent criminal trial in December 2004,

24  Judge Thomas J. Wynne ruled that A.B. lacked the mental capacity and memory to retain an

25  independent recollection of the alleged 2002 molestations.  Christie Decl., docket no. 30, Ex. D.

26  Accordingly, the Court ruled that A.B. would not be permitted to testify at trial.  Id.  As a result,

27  the charges against Paul II were dismissed with prejudice on January 7, 2005.

28  ORDER - 5

1   Plaintiffs assert causes of action for violation of Paul II's Fourth, Fifth, Sixth and

2   Fourteenth Amendment rights under 42 U.S.C. § 1983.  Plaintiffs also bring a state law claim for

3   intentional infliction of emotional distress.  The City of Everett and Detective Jensen move for

4   summary judgment on all claims.

5   **III.   DISCUSSION**

6   Summary judgment is appropriate where there is no genuine issue of material fact and the

7   moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving

8   party bears the initial burden of demonstrating the absence of a genuine issue of material fact.

9   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden,

10  the opposing party must show that there is a genuine issue of fact for trial.  Matsushita Elec.

11  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party must present

12  significant and probative evidence to support its claim or defense.  Intel Corp. v. Hartford

13  Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

14  In order to defeat a motion for summary judgment, the non-moving party must make more

15  than conclusory allegations, speculations, or argumentative assertions that material facts are in

16  dispute.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994).  In ruling on a motion for

17  summary judgment, the Court may only consider evidence that would be admissible at trial, and

18  may not consider inadmissible hearsay.  Key Bank of Puget Sound v. Alaskan Harvester, 738 F.

19  Supp. 398, 401 (W.D. Wash. 1989).

20  For purposes of this motion for summary judgment, reasonable doubts as to the existence

21  of material facts are resolved against the moving party and inferences are drawn in the light most

22  favorable to the opposing party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir.

23  2000).  However, if no factual showing is made in opposition to a motion for summary

24  judgment, the district court is not required to search the record *sua sponte* for some genuine

25  issue of material fact.  See Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1029

26  (9th Cir. 2001) ("The district court may limit its review to the documents submitted for the

27  purposes of summary judgment and those parts of the record *specifically* referenced therein.")

28  ORDER - 6

1 (emphasis added).

2 **A.    42 U.S.C. § 1983 – Detective Jensen**

3        Personal liability under 42 U.S.C. § 1983 may follow individual involvement in

4 unconstitutional conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified

5 immunity, however, provides broad protection to government officials, and safeguards "all but

6 the plainly incompetent or those who knowingly violate the law . . . ."  Malley v. Briggs, 475

7 U.S. 335, 341 (1986); see also Saucier v. Katz, 533 U.S. 194, 205 (2001).  Detective Jensen

8 contends he is entitled to qualified immunity from suit.

9        The Ninth Circuit follows a two-step inquiry in considering qualified immunity.  The

10 Court must first determine if the evidence, taken in the light most favorable to the plaintiff,

11 shows that a constitutional violation occurred.  Kennedy v. City of Ridgefield, 411 F.3d 1134,

12 1141 (9th Cir. 2005).  If a constitutional violation occurred, the Court must determine whether

13 the law underlying the constitutional violation was "clearly established" at the time of the

14 violation.  Id.  In this second step, the Court decides if the individual made a reasonable mistake

15 about what the law requires.  Id. at 1142.

16        **1.    Fifth Amendment**

17        Plaintiffs assert that Detective Jensen violated Paul II's Fifth Amendment rights through a

18 coercive interrogation in disregard of Paul II's right against self-incrimination.  Plaintiffs allege

19 that Paul II was not allowed to leave the principal's office, and did not knowingly waive his

20 Miranda rights.  Plaintiffs allege that Paul II failed to understand his right to remain silent, did

21 not understand his right to counsel, and was coerced into a confession through improper

22 questioning.  In support of this argument, Plaintiffs submit the testimony of Drs. Whitehill and

23 Robinson, who opine that Paul II's "confession" looked like a classic coerced and fabricated

24 confession.  See Andrews Decl., docket nos. 42, 43, Exs. 9A, 9B.

25        In the state proceedings, Judge Castleberry concluded that "[a]t the time of the signing, it

26 would have appeared to Detective Jensen," but that Paul II "lacked the capacity to understand

27 his rights" and "could not make an intelligent or knowing waiver of his rights."  Andrews Decl.,

28 ORDER - 7

1   docket no. 30, Ex. 1 (Findings & Order on CrR 3.5 Hearing) at 2.  Judge Castleberry concluded

2   that Paul II's confession was the "product of impermissible coercion," and suppressed the

3   confession.  Id., Ex. 1 at 2-3.  Defendants argue that even if Paul II's Miranda rights were

4   violated during his interrogation in the principal's office, there is no cognizable remedy under §

5   1983 because the failure to give an effective Miranda warning does not give rise to a Fifth

6   Amendment cause of action under § 1983.  Plaintiffs contend that Paul II's Fifth Amendment

7   rights were violated because his confession was coerced by Detective Jensen.  Defendants note

8   that Detective Jensen read Paul II his Miranda warning, and that Paul II signed a waiver form.

9   See Jensen Decl., docket no. 28, ¶ 7.

10          In Chavez v. Martinez, 538 U.S. 760 (2003), the Supreme Court overruled a line of cases

11   that held a violation of Fifth Amendment rights as a result of a coercive interrogation would

12   support a § 1983 action, even where the coerced statements were never used in a criminal

13   proceeding.  The Supreme Court rejected the view that the Fifth Amendment was offended by

14   "coercive interrogation practices that are destructive of human dignity," Martinez v. City of

15   Oxnard, 270 F.3d 852, 857 (9th Cir. 2001); the Court concluded that a § 1983 claim for a Fifth

16   Amendment violation required the use of the coerced statements in a "criminal case."  Chavez,

17   538 U.S. at 765.  The Supreme Court declined to define "criminal case," as used in the Fifth

18   Amendment:

19          In our view, a "criminal case" at the very least requires the initiation of legal proceedings.
             . . .  We need not decide today the precise moment when a "criminal case" commences; it
20           is enough to say that police questioning does not constitute a "case" any more than a
             private investigator's precomplaint activities constitute a "civil case."

21
22   Id. at 766-67.  Thus, "the act of coercing a statement from a suspect, in and of itself, is not an act

23   in violation of the Fifth Amendment self-incrimination clause upon which a § 1983 claim may

24   be predicated."  Crowe v. County of San Diego, 303 F. Supp. 2d 1050, 1087 (S.D. Cal. 2004).

25   To the extent Paul II alleges a Fifth Amendment violation as the basis for his § 1983 claim, the

26   statements from his coerced confession must have been used against him in a "criminal case."

27          The parties dispute whether Paul II's statements were used against him in a "criminal

28   ORDER - 8

case." Criminal charges against Paul II were based on his confession to Detective Jensen, and the statements of the alleged victim, A.B. However, Paul II's confession was suppressed and was not used against him at trial.

The analysis of the plurality in <u>Chavez</u> strongly suggests that the Fifth Amendment privilege is a "trial right." <u>See id.</u> at 767 (citing <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 264 (1990) ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial right* of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, *a constitutional violation occurs only at trial*" (emphases added; citations omitted)); <u>see also</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 692 (1993) (describing Fifth Amendment as a "'trial right'")). Based on this analysis, the district court in <u>Crowe</u> found that "criminal case," as used in the Fifth Amendment, necessarily was limited to a "criminal trial," or "a proceeding at which a defendant's guilt is determined." 303 F. Supp. 2d at 1091. <u>Crowe</u> rejected the notion that use of coerced statements in grand jury proceedings, or at a hearing to determine whether the boys should be tried in adult rather than juvenile court, constituted use in a "criminal case." <u>Id.</u> at 1088.

In this case, Judge Castleberry held a hearing pursuant to Washington's Criminal Rule 3.5 (the "CrR 3.5 hearing"), for the purpose of determining the admissibility of Paul II's confession. Andrews Decl., docket no. 42, Ex. 9 (Transcript of Proceedings). Detective Jensen, Paul II, and various experts testified regarding Paul II's understanding of his waiver of rights, at the time of his confession. <u>See</u> Andrews Decl., docket no. 33, Ex. 1 (Findings and Order on CrR 3.5 Hearing). Judge Castleberry concluded the statements were the "product of impermissible coercion," and suppressed all statements by Paul II. <u>Id.</u> Plaintiff argues that Paul II was compelled to be a witness against himself, in a criminal case, because he was faced with his own confession at the CrR 3.5 hearing. However, like the pretrial hearing and grand jury proceedings in <u>Crowe</u>, Paul II was not forced to confront his coerced statements in a criminal proceeding where his guilt would be determined. Rather, the pretrial CrR 3.5 hearing merely determined the admissibility of the statements in future proceedings.

1    The fact that the hearing could have ultimately led to Paul II's confronting his own

2    incriminating statements at trial, in violation of the Fifth Amendment, does not itself effect a

3    constitutional violation.  See Verdugo-Urquidez, 494 U.S. at 264 ("Although conduct by law

4    enforcement officials prior to trial may ultimately impair that right, a constitutional violation

5    occurs only at trial . . .").  The CrR 3.5 hearing is not unlike the 707 hearing considered in

6    Crowe: the guilt of the defendant was ultimately not at issue.  The Court finds "criminal case,"

7    as used in Chavez, means "criminal trial," a proceeding at which a defendant's guilt is

8    determined.  Accordingly, Paul II has failed to make out a cognizable § 1983 claim for violation

9    of his Fifth Amendment privilege against compelled self-incrimination, and Defendants are

10   entitled to summary judgment on this claim.[4]

11   **2.      Sixth Amendment Rights**

12   The Complaint alleges that Paul II was deprived of his right to counsel.  Compl., docket

13   no. 8, ¶ 4.2(d).  The Defendants interpret this as a § 1983 claim pursuant to the Sixth

14   Amendment right to counsel, which attaches only after an adversarial proceeding is commenced.

15   See Massiah v. United States, 377 U.S. 201, 206 (1964).  Defendants move for summary

16   _____

17   [4] Even if the Court were to find that Paul II's Fifth Amendment rights were violated, the
     Court would find that the violation of his rights was not clearly established in light of Chavez.

18

19       Our views on the proper scope of the Fifth Amendment's Self-Incrimination
         Clause do not mean that police torture or other abuse that results in a confession is
20       constitutionally permissible so long as the statements are not used at trial; it simply
         means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth
21       Amendment's Self-Incrimination Clause, would govern the inquiry in those cases
         and provide relief in appropriate circumstances.
22

23   Chavez, 538 U.S. at 773.  A Fifth Amendment violation for a coercive interrogation was
     not clearly established where Detective Jensen provided Paul II with a Miranda warning,
24   and could reasonably have believed that Paul II understood his rights.  Andrews Decl.,
     docket no. 30, Ex. 1 (Findings & Order on CrR 3.5 Hearing) at 2.  Accordingly, even if
25   Detective Jensen made a mistake as to what the law required, Detective Jensen is entitled
     to qualified immunity from suit for claims regarding his violation of Paul II's Fifth
26   Amendment rights.

27

28   ORDER - 10

judgment on the grounds that no criminal proceedings were brought at the time of the interview. Plaintiffs do not respond. The Court finds no violation of Paul II's Sixth Amendment rights. Defendants are entitled to summary judgment on this claim.

### 3.   Fourth Amendment Rights

Plaintiffs also assert that Detective Jensen violated Paul II's Fourth Amendment rights because he "lacked probable cause to arrest or custodially interrogate Paul II at his school . . . ." See Response, docket no. 32, at 15. Plaintiffs assert that any detention of Paul II was in violation of his Fourth Amendment rights. Defendants counter that the questioning of Paul II at his school was not a custodial interrogation or arrest, and that any arrest was supported by probable cause.

*(a)   Custodial interrogation.*

Plaintiffs Fourth Amendment claims are based on the presumption that Paul II was "arrest[ed] or custodially interrogat[ed] . . . at his school." If Paul II's questioning at the school was not custodial, Plaintiffs' § 1983 claim for a violation of Fourth Amendment rights cannot stand. Defendants argue that Paul II was not under arrest or in custody during his questioning at the school. The Defendants contend there is no evidence Paul II was threatened if he refused to speak with Detective Jensen, no evidence Paul II asked to leave, and no evidence that Detective Jensen refused to let him leave.

In determining whether an individual was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). The Court considers "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

ORDER - 11

1   Detective Jensen explained to Paul II that he was "required" to read Miranda rights before

2   he could talk to him.  Jensen Decl., docket no. 28, Ex. A, at 13.  This could have led a

3   reasonable student to believe he was in custody or under arrest.  Indeed, Paul II states in his

4   declaration that he "thought [he] just had to sit there and do what [Detective Jensen] said."  Paul

5   II Decl., docket no. 37, at 3.  Moreover, Detective Jensen understood from his discussions with

6   prosecuting attorney John Stansell that Miranda warnings were required "since the interview

7   was to take place at a school where the child was not free to leave."  Jensen Decl., docket no.

8   28, ¶ 6.  Taking every inference in favor of the non-moving party, the Court must conclude that

9   Paul II's questioning was custodial.  See, e.g., State v. D.R., 84 Wn.App. 832, 838, review

10   denied, 132 Wn.2d 1015 (1997) (holding D.R. was in custody when questioned by a detective,

11   in the principal's office, at his school because the detective did not inform him he was free to

12   leave, D.R. was only 14-years-old, the principal's office is a naturally coercive environment for

13   children of his age, and the interrogation was accusatory in nature).

14        (b)    Probable cause.

15   The Defendants argue that even if Paul II's interrogation was custodial, it was not

16   improper because there was probable cause to believe Paul II committed a crime.  See Tennessee

17   v. Garner, 471 U.S. 1, 8 (1985).  Probable cause exists where, "under the totality of

18   circumstances known to the arresting officers, a prudent person would have concluded that there

19   was a fair probability that [the defendant] had committed a crime."  United States v. Potter, 895

20   F.2d 1231, 1233-34 (9th Cir. 1990).

21   Defendants claim that Detective Jensen had probable cause because the conduct alleged

22   by A.B. and her mother met the definition of child molestation in the first degree and because

23   Detective Jensen was acting pursuant to A.B.'s claim that Paul II touched her vagina.  Plaintiffs

24   argue that Detective Jensen's investigation was based only on mere suspicion after the "confused

25   statement" of a "very young girl."  Plaintiffs cite to numerous deficiencies in Detective Jensen's

26   interview of A.B., including the questions he asked and the answers given by A.B.  Detective

27   Jensen contends that the hearsay statements of A.B. to mother and his own interview of A.B.

28   ORDER - 12

1  establish probable cause.

2        On December 19, 2003, A.B.'s mother walked into the room where A.B. was playing and

3  "she had her pants down and was touching her self (sic)."  Anders Decl., docket no. 29, Ex. B

4  (Johnson Statement) at 1.  A.B.'s mother questioned her about what she had been doing.

5        [A.B.] said [Paul] pulled down his pants & pulled his little thing out & pulled her
       pants down & put it on her.  I asked did it hurt she said no.  I said did it go inside?
6       she said no?  I asked where the pastor was she said not @ home and tammie the
       (mom) was @ the church.  Annessa the 16 year old daughter was down stairs and
7       [A.B.] and Paul were in the room.

8        * * *

9        I said did he say anything when he did this? she said don't tell people or mommy?

10  Id., Ex. B at 1-2.  On December 23, 2003, Everett police officer Margaret Anders spoke with

11  A.B.'s mother.  Officer Anders made an initial report which recounted the statements by A.B. to

12  her mother, which was forwarded to Detective Jensen.  Id., Ex. B at 3.

13        Detective Jensen interviewed A.B. on January 8, 2004.  Jensen Decl., docket no. 28,

14  Ex. A.  Detective Jensen's interview of A.B. took place approximately 18 months after the

15  alleged sexual molestation by Paul II.  Detective Jensen felt A.B. had average to above-average

16  intelligence, and possessed excellent verbal and communication skills for a child her age.  Id.,

17  Ex. A, at 1.  Detective Jensen felt A.B. was telling the truth at all times during the interview,

18  with regard to Paul II's actions.  Id. ¶ 5.  A.B. stated that Paul II put his penis on her privates,

19  told her to "taste" his penis, and licked her vagina.  Id., Ex. A, at 3-4.  Detective Jensen's report

20  indicates he did not introduce Paul II's name into the conversation, id. ¶ 5, and that A.B.

21  distinguished other members of the Stoot family.  Id.  A.B. also stated that she licked Paul II's

22  penis and he licked her bottom, and she identified the location in the Stoot home where the

23  alleged sexual molestation took place.  Id., Ex. A, at 9.  A.B. also identified "Preston" as another

24  child that she had previous sexual contact with.  Id., Ex. A, at 11.

25        Courts have generally permitted law enforcement officers to establish probable cause

26  based only on the testimony of a sexual assault victim, without additional corroborating

27  evidence, even when the evidence is contradictory.  Absent an indication to the contrary, a

28  ORDER - 13

1    police officer is entitled to rely upon information supplied by the victim of an alleged sexual

2    assault.  E.g. Clay v. Conlee, 815 F.2d 1164, 1168 (8th Cir. 1987); Easton v. City of Boulder,

3    Colo., 776 F.2d 1441, 1449-50 (10th Cir. 1985).  In Easton, the Court expressly noted that the

4    accusations of three and five year old children contained "significant" discrepancies, and the

5    possibility that the testimony would be inadmissible in court.  However, the Court held that the

6    children's accusations established probable cause.  Easton, 776 F.2d at 1449-50.  Underlying

7    Easton was the realization that in many child molestation cases, the only available evidence is

8    the testimony of children.  See id.

9         Under the circumstances of this case, whether Detective Jensen had probable cause to

10   believe Paul II committed the crime of child molestation presents a difficult and close question.

11   However, at oral argument Defendants' counsel conceded – for purposes of the qualified

12   immunity analysis, at least – that reasonable minds could differ as to whether Detective Jensen

13   had probable cause to arrest Paul II before the questioning at the school.[5]  If Detective Jensen

14   did not have probable cause, then a custodial interrogation of Paul II was in violation of his

15   Fourth Amendment rights.

16        Because Defendants concede that reasonable minds could differ with regard to whether

17   Detective Jensen had probable cause, the Court proceeds to the second step of the Saucier

18   analysis and must determine whether the law underlying the constitutional violation was "clearly

19   established" at the time of the violation.  Id.  In this second step, the Court decides whether

20   Detective Jensen made a reasonable mistake about what the law requires.  Id. at 1142.

21        (c)    Clearly established.

22        Taking every inference in favor of Paul II, Detective Jensen did not have probable cause

23   before the interview and Paul II's custodial interrogation was in violation of his Fourth

24   Amendment rights.  If Detective Jensen made a reasonable mistake about what the law requires,

25

26        [5] The Court asked Mr. Christie: "You would concede it's factual as to whether there was
     probable cause to arrest before the interview?"  Mr. Christie responded: "Reasonable minds
27   could differ on that."  Rough Tr. at 10.

28   ORDER - 14

1  however, he is still entitled to qualified immunity.

2       A police officer is generally entitled to rely on information supplied by the victim of an

3  alleged sexual assault.  Clay, 815 F.2d at 1168.  Courts have not distinguished between first-

4  hand accusations made by three and five year old children, even where the testimony contains

5  discrepancies.  Easton, 776 F.2d at 1449-50.  Probable cause does not follow hearsay statements

6  by parents as to what they were told by two-year old and three-year old sexual assault victims.

7  Shaw, 464 F.3d at 625; Cortez, 478 F.3d at 1119-20.  However, Shaw suggests that an interview

8  of a child sexual assault victim may be required to establish probable cause.  See Shaw, 464

9  F.3d at 626.  Detective Jensen interviewed the alleged victim in this case.  To the extent

10  Detective Jensen violated Paul II's rights by questioning him in a custodial situation without

11  probable cause, he reasonably could have believed his conduct was lawful.  A reasonable officer

12  in Detective Jensen's position could have believed that the statements by the victim established

13  probable cause, notwithstanding the significant amount of time between the accusations by A.B.

14  and the alleged molestation, and A.B.'s young age.  Accordingly, Detective Jensen is entitled to

15  qualified immunity with regard to Paul II's § 1983 claims for violation of his Fourth Amendment

16  rights, and is entitled to summary judgment on this claim.

17       **4.      Fourteenth Amendment Rights**

18       Plaintiffs assert that Detective Jensen violated Paul II's Fourteenth Amendment rights by

19  coercing his confession and by destroying notes taken by the Detective during the interview.  In

20  order for conduct to sustain a claim under the Fourteenth Amendment it must "shock the

21  conscience" and violate the "decencies of civilized conduct."  See County of Sacramento v.

22  Lewis, 523 U.S. 833, 846-47 (1998).  The Constitution does not guarantee "due care" on behalf

23  of government officials: liability for negligently inflicted harm falls beneath the threshold of

24  constitutional due process.  Id. at 848-49.

25       Defendants note that conduct far more shocking and coercive than the allegations in this

26  case has been found not to violate the Fourteenth Amendment:

27       While it is true that the interrogation lasted for eight hours, [interrogator] Perez did

28  ORDER - 15

not refuse to give Cunningham a break for food or water.  Perez also never yelled and failed to use violence or the threat of violence.  Perez's questions may have unsettled Cunningham, but mere emotionalism and confusion do not invalidate confessions.  Further, continuing to question a suspect after the suspect claims he is innocent does not constitute coercion and is often necessary to achieve the truth.  Perez's suggestion that Cunningham's cooperation could lead to treatment rather than prison is also not coercive.  Similarly, Perez's statement that he has put people in prison did not contribute to undermining Cunningham's free will.  Officers are allowed to recite the sentence a suspect may receive if found guilty.

Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003) (internal citations omitted).  Promises, threats, and coercion of the type which form the basis of Plaintiffs' Fourteenth Amendment claim have been considered by the Ninth Circuit; such claims have not been held to form the basis for a Fourteenth Amendment violation.

While the Court considers the fact that Paul II was a minor, the conduct at issue in this case is far less egregious than the conduct outlined in Cunningham.  Detective Jensen's conduct cannot be said to "shock the conscience."  Judge Castleberry noted in his Order from the CrR 3.5 hearing that:

> 18.    At the time of the signing, it would have appeared to Detective Jensen that Defendant understood his rights; however, Defendant lacked the capacity to understand his rights and the Defendant could not make an intelligent or knowing waiver of his rights.  The general rule is that a child over the age of 12 may be interviewed without presence of parents and may make a waiver of rights.

Andrews Decl., docket no. 30, Ex. 1 (Findings & Order on CrR 3.5 Hearing) at 2.  Under all the circumstances, and taking every inference in Paul II's favor, Detective Jensen did not violate his Fourteenth Amendment rights through an unduly coercive or improper interrogation.[6]  Because the Court finds no constitutional violation, the Court does not reach the second step of the Saucier analysis.

---

[6] Plaintiffs also allege that Detective Jensen violated Paul II's Fourteenth Amendment rights by destroying his notes of the interrogation.  This claim, however, was not plead in the Complaint and cannot be raised for the first time at summary judgment.  Moreover, similar claims have been rejected by the Ninth Circuit.  Cunningham, 345 F.3d at 812 ("failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause unless the officer acted in bad faith.").

ORDER - 16

1  Detective Jensen is entitled to qualified immunity from suit and summary judgment is
2  therefore granted in his favor on all claims under 42 U.S.C. § 1983.

3  **B.      42 U.S.C. § 1983 – City of Everett**

4  Plaintiffs also assert claims against the City of Everett under § 1983.  There is no
5  *respondeat superior* liability under § 1983; local government units may only be sued for injury
6  where the constitutional deprivation arises from a government custom or official policy.  Monell
7  v. Dept. of Soc. Servs., 436 U.S. 658, 691-92 (1978).  Absent a constitutional violation, there
8  can be no municipal liability under § 1983.  Id. at 692.  Considering the facts of this case in the
9  light most favorable to the Plaintiffs, Detective Jensen violated Paul II's Fourth Amendment
10 rights when he questioned him in a custodial situation without probable cause.  Under Monell,
11 however, municipal liability requires a government custom or official policy which resulted in
12 the violation.  See Monell, 436 U.S. at 691.

13 Plaintiffs allege two unconstitutional policies which they allege subject the City of
14 Everett to liability under § 1983.  Plaintiffs first urge that the City, as a matter of course,
15 disregarded its own policy to require a child victim specialist to interview young children.
16 Detective Jensen conducted "scores" of child sexual assault interviews, and Plaintiffs allege that
17 the City of Everett's choice to use Detective Jensen – a "street detective" – in lieu of a trained
18 specialist was an unconstitutional policy and custom that resulted in a violation of Paul II's
19 constitutional rights.  However, this argument is unsupported in law or fact.  The Ninth Circuit
20 has explicitly held in the sexual abuse context that "no constitutional due process right to have
21 child witnesses, in a child sexual abuse investigation, interviewed in a particular manner or
22 pursuant to a certain protocol."  Devereaux v. Perez, 218 F.3d 1045, 1053 (9th Cir. 2000).
23 Moreover, there is no evidence that Detective Jensen was unqualified to interview A.B.  The
24 evidence before the Court is that Detective Jensen had 280 hours of training focused on child
25 physical and sexual abuse, and an additional 32 hours of training on forensic child interviewing
26 techniques.  Jensen Decl., docket no. 28, ¶ 2.  In light of Detective Jensen's training and
27 Devereaux, there is no basis for Plaintiffs' claim that the City of Everett had an unconstitutional

28 ORDER - 17

1  policy or custom that resulted in a violation of Paul II's constitutional rights.

2       Plaintiffs second argument is that the City failed to properly train and supervise Detective

3  Jensen with regard to his interview of juveniles.  Plaintiffs contend that City policies for

4  interrogation of juvenile suspects were "likely to lead to improper interrogations and false

5  confessions in violation of the constitution," because they did not record interrogations.

6  However, no constitutional violation resulted from Detective Jensen's questioning.  <u>See</u>

7  <u>Cunningham</u>, 345 F.3d 802.  A constitutional violation, if any, resulted from Detective Jensen's

8  reasonable, but mistaken, view that his interview of A.B. established probable cause for the

9  custodial interview of Paul II.

10       Plaintiffs have failed to identify facts in support of their claim that a government custom

11  or policy resulted in a violation of Paul II's constitutional rights; accordingly, Plaintiffs' § 1983

12  claims against the City of Everett are barred.  <u>See</u> <u>Monell</u>, 436 U.S. at 691-92.

13  **C.  Outrage**

14       Plaintiffs have also asserted a cause of action against Detective Jensen and the City of

15  Everett for intentional infliction of emotional distress ("outrage").  The tort of outrage requires

16  proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless

17  infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress.

18  <u>See</u>, <u>e.g.</u>, <u>Kloepfel v. Bokor</u>, 149 Wn. 2d 192, 195-96 (2003).  A claim for intentional infliction

19  of emotional distress must be predicated on behavior "so outrageous in character, and so extreme

20  in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

21  utterly intolerable in a civilized community."  <u>Grimsby v. Samson</u>, 85 Wn. 2d 52, 59 (1975).

22  The tort of outrage "does not extend to mere insults, indignities, threats, annoyances, petty

23  oppressions, or other trivialities."  <u>Id.</u>  Plaintiffs "must necessarily be hardened to a certain

24  degree of rough language, unkindness and lack of consideration."  <u>Id.</u>

25       The Court must first determine if the conduct complained of may reasonably be regarded

26  as extreme and outrageous, thus warranting a factual determination by the jury.  <u>E.g.</u> <u>Robel v.</u>

27  <u>Roundup Corp.</u>, 148 Wn. 2d 35 (2002).  The Courts have set a high standard for sufficiently

28  ORDER - 18

1   outrageous conduct.  Id. at 49 ("[T]he standard for an outrage claim is admittedly very high (by

2   which we mean that the conduct supporting the claim must be appallingly low) . . .").  The tort is

3   sustainable only where the conduct is extreme and outrageous.  Kloepfel, 149 Wn. 2d 192

4   (harassment and death threats, including hundreds of phone calls over a course of years was

5   sufficiently outrageous); Robel, 148 Wn.2d 35 (harassing and calling an injured employee

6   "bitch" and the C-word, "acting out" fake back injuries, and pretending to call L & I was

7   sufficiently outrageous).  Courts have refused to extend the tort of outrage to insults, threats and

8   minor indignities.  Grimsby, 85 Wn. 2d at 59.

9        Under all the circumstances of this case, Detective Jensen's actions cannot reasonably be

10  characterized as "atrocious," or "utterly intolerable in a civilized community."  Detective

11  Jensen's interrogation of Paul II was undertaken after his interview with A.B., who had

12  identified Paul II as engaging in illegal sexual contact with her.  Detective Jensen's actions were

13  undertaken during the course of legitimate police business and cannot be described as

14  "outrageous in character" or "extreme in degree."  Accordingly, the Defendants are entitled to

15  summary judgment on this claim.

16  **III.   CONCLUSION**

17       For the reasons stated in this Order, Defendants' Motion for Summary Judgment, docket

18  no. 27, is GRANTED.  The Clerk is directed to enter judgment in favor of Defendants

19  dismissing this case with prejudice.

20

21       IT IS SO ORDERED

22       DATED this 26th day of April, 2007.

23

24

25       _____
         Thomas S. Zilly
26       United States District Judge

27

28  ORDER - 19